# No. 17-51077

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JORGE EDUARDO NAVA,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

**BRIEF OF DEFENDANT-APPELLANT**

———————————

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206
Tel.: (210) 472-6700
Fax: (210) 472-4454

JUDY FULMER MADEWELL
Chief of Appeals

*Attorney for Defendant-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

## UNITED STATES v. JORGE EDUARDO NAVA,
## No. 17-51077

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Jorge Eduardo Nava,** Defendant-Appellant;

2. **John F. Bash,** U.S. Attorney;

3. **Jose Luis Acosta,** Assistant U.S. Attorney, who represented the Government in the district court;

4. **Randolph Joseph Ortega,** who represented Defendant-Appellate in the district court;

5. **Maureen Scott Franco,** Federal Public Defender;

6. **Judy Fulmer Madewell,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Judy Fulmer Madewell

JUDY FULMER MADEWELL

*Attorney for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Jorge Eduardo Nava requests oral argument.  On appeal, Nava argues that the district court erred in determining the base offense level for his cocaine offenses by including, as relevant conduct, an uncharged, unadjudicated methamphetamine offense. This error increased Nava's punishment by 10 to 16 years. Nava also argues that the district court plainly erred by applying the enhancement for abuse of a position of trust. Oral argument would be helpful to the Court because the record is long, involving a jury trial and sentencing, and the issue raised is fact-intensive. Oral argument would enable the parties to point to evidence in the record that supports their arguments.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................... i

STATEMENT REGARDING ORAL ARGUMENT ........................ ii

TABLE OF AUTHORITIES ............................................. v

SUBJECT MATTER AND APPELLATE JURISDICTION ............ 1

ISSUES PRESENTED FOR REVIEW ............................................. 2

STATEMENT OF THE CASE ........................................................ 3

SUMMARY OF THE ARGUMENTS ........................................... 20

ARGUMENTS AND AUTHORITIES ........................................... 24

I.  The District Court Erred in Calculating Nava's Base
    Offense Level for his Cocaine Offenses by Including, as
    Relevant Conduct, a Quantity of Methamphetamine from
    an Unrelated, Unadjudicated Offense. .................................... 24

    A.  Standard of Review. ............................................................ 24

    B.  The Government Failed to Prove That the
        Methamphetamine Was Attributable to Nava as
        Relevant Conduct ................................................................. 25

        1.  The methamphetamine offense was not part of a
            common scheme or plan with the cocaine offenses ....... 25

        2.  The methamphetamine offense was not part of the
            same course of conduct as the cocaine offenses. ........... 31

II. Permitting Courts to Find a Defendant Committed an
    Offense by a Preponderance of the Evidence Violates the
    Fifth Amendment. ...................................................................... 36

    A.  Standard of Review. ............................................................ 37

B. A defendant's liberty interest is implicated at sentencing and requires application of the beyond-a-reasonable-doubt standard. ................................................. 37

C. The allocation of risk regarding erroneous determinations warrants applying a reasonable-doubt standard. ............................................................. 39

D. The advisory nature of the guidelines does not diminish the threat posed to the interests protected by the Due Process Clause. ................................................. 41

E. The government cannot prove that, under a reasonable-doubt standard, the district court would have made the same finding. ........................................................ 44

III. The District Court Plainly Erred by Applying the Abuse of Position of Trust Enhancement. ............................................. 45

A. Standard of Review. ............................................................. 45

B. The district court plainly erred in applying the abuse of trust enhancement. ............................................................. 46

CONCLUSION ................................................................. 52

CERTIFICATE OF SERVICE ....................................................... 53

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ................................................................. 54

# TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas,*
   441 U.S. 418 (1979) .......................................................... 39, 40

*Apprendi v. New Jersey,*
   530 U.S. 466 (2000) ..................................36, 38, 41, 43

*In re Winship,*
   397 U.S. 358 (1970) .......................................................... 38, 40

*Jones v. United States,*
   526 U.S. 227 (1999) ..................................................................... 39

*McMillan v. Pennsylvania,*
   477 U.S. 79 (1986) ....................................................................... 43

*Molina-Martinez v. United States,*
   136 S. Ct. 1338 (2016) ....................................................... 42, 46

*Mullaney v. Wilbur,*
   421 U.S. 684 (1975) ................................................................... 38

*Peugh v. United States,*
   569 U.S. 530 (2013) ................................................................... 42

*United States v. Benns,*
   740 F.3d 370 (5th Cir. 2014) ..................................................... 30

*United States v. Booker,*
   334 F.3d 406 (5th Cir. 2003) .............................................*passim*

*United States v. Brown,*
   7 F.3d 1155 (5th Cir. 1993) ................................................ 17, 49

*United States v. Castaneda,*
   740 F.3d 169 (5th Cir. 2013) (per curiam) ............................... 46

*United States v. Chavira,*
   530 F. App'x 330 (5th Cir. 2013) ............................................... 32

*United States v. Contreras,*
   581 F.3d 1163 (9th Cir. 2009), *adopted by United States v.
   Contreras,* 593 F.3d 1135 (9th Cir. 2010) (en banc) ................. 50

*United States v. Deville,*
   278 F.3d 500 (5th Cir. 2002) ............................................... 48, 49

*United States v. Dyer,*
   220 F.3d 585 (5th Cir. 2000) (unpublished).............................. 34

*United States v. Fields,*
   483 F.3d 313 (5th Cir. 2007) ....................................................... 41

*United States v. Hale,*
   685 F.3d 522 (5th Cir. 2012) ....................................................... 48

*United States v. Hammoud,*
   381 F.3d 316 (4th Cir. 2004) (en banc) ..................................... 39

*United States v. Heard,*
   891 F.3d 574 (5th Cir. 2018) ....................................................... 34

*United States v. Hill,*
   915 F. 2d 502 (9th Cir. 1990), *overruled by
   United States v. Contreras,* 593 F.3d 1135
   (9th Cir. 2010) (en banc)................................................ 17, 49, 50

*United States v. Lewis,*
   476 F.3d 369 (5th Cir. 2007) ............................................... 22, 37

*United States v. Miller,*
   906 F.3d 373 (5th Cir. 2018) ....................................................... 47

*United States v. Ollison,*
   555 F.3d 152 (5th Cir. 2009) ............................................... 46, 47

*United States v. Ortiz,*
   613 F.3d 550 (5th Cir. 2010) ...............................................*passim*

*United States v. Pimental,*
  367 F. Supp. 2d 143 (D. Mass. 2005) ........................................ 43

*United States v. Ramos-Delgado,*
  763 F.3d 398 (5th Cir. 2014) .................................................... 45

*United States v. Ramos-Rodriguez,*
  809 F.3d 817 (5th Cir. 2016) .................................................... 32

*United States v. Rhine,*
  583 F.3d 878 (5th Cir. 2009) ........................................ 25, 30, 33

*United States v. Rodriguez,*
  73 F.3d 161 (7th Cir. 1996) ....................................................... 39

*United States v. Rodriguez-Garcia,*
  657 F. App'x 252 (5th Cir. 2016) .............................................. 32

*United States v. Tribble,*
  206 F.3d 634 (6th Cir. 2000) .................................................... 50

*United States v. Vasquez,*
  370 F. App'x 459 (5th Cir. 2010) ........................................ 29, 32

*United States v. Wall,*
  180 F.3d 641 (5th Cir. 1999) .................................................... 25

*Washington v. Harper,*
  494 U.S. 210 (1990) ................................................................ 37

## Constitutional Provisions

U.S. Const. amend. V ....................................................2, 21, 36, 37

U.S. Const. amend. VI ......................................................... 36, 42

## Statutes

18 U.S.C. § 3231 ......................................................................... 1

18 U.S.C. § 3553(a) .................................................................. 42

18 U.S.C. § 3661..................................................................... 41

18 U.S.C. § 3742(a) ................................................................. 1

21 U.S.C. § 841(a)(1) ........................................................... 9, 10

21 U.S.C. § 841(b)(1)(A) .......................................................... 9

21 U.S.C. § 841(b)(1)(B) ......................................................... 10

21 U.S.C. § 846...................................................................... 9

28 U.S.C. § 1291 .................................................................... 1

## Rules

Fed. R. App. P. 32(a)(5)......................................................... 54

Fed. R. App. P. 32(a)(6)......................................................... 54

Fed. R. App. P. 32(a)(7)(B) ..................................................... 54

Fed. R. App. P. 32(f)............................................................. 54

Fed. R. App. P. 4(b)(1)(A)(i) ................................................... 1

Fed. R. Crim. P. 52(b) ........................................................... 45

Fed. R. Evid. 1101(d)(3) ......................................................... 41

## United States Sentencing Guidelines

U.S.S.G. §1B1.3........................................................... 2, 15, 21

U.S.S.G. §1B1.3(a)(1)(A)–(B) .................................................. 25

U.S.S.G. §1B1.3(a)(2) ............................................................ 25

U.S.S.G. §1B1.3, comment. (n.5(B)(i)) (2016).............................. 26

U.S.S.G. §1B1.3, comment. (n.5(B)(ii)) (2016)............................. 31

U.S.S.G. §2D1.1 ................................................................ 25

U.S.S.G. §2D1.1(c)(4) ...................................................... 16

U.S.S.G. §3B1.3 .......................................................... *passim*

U.S.S.G. §3B1.3, cmt. (n.1) (2016) ................................. 47

U.S.S.G. §3B1.3, comment. (n.1) ..................... 47, 48, 50

U.S.S.G. §3D1.2(b) ........................................................... 14

U.S.S.G. §3D1.2(d) ........................................................... 14

U.S.S.G. Ch.5 Pt.A, comment. (n.2) .............................. 17

U.S.S.G. §6A1.3(a) ......................................................... 41

## SUBJECT MATTER AND APPELLATE JURISDICTION

1. **Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of alleged offenses against the laws of the United States. The district court had jurisdiction under 18 U.S.C. § 3231.

2. **Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the United States District Court for the Western District of Texas, entering judgment of criminal conviction and sentence under the Sentencing Reform Act of 1984. This Court has jurisdiction of the appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

A criminal defendant must file notice of appeal in the district court within 14 days after the entry either of the judgment or the order being appealed. Fed. R. App. P. 4(b)(1)(A)(i). In this case, the written judgment was entered on November 29, 2017, and notice of appeal was filed on December 4, 2017. ROA.11, 223–24.

## ISSUES PRESENTED FOR REVIEW

1. In calculating Nava's base offense level for his cocaine offenses, did the district court err by including, as relevant conduct under guideline §1B1.3, an amount of methamphetamine from an unrelated, unadjudicated offense?

2. Did the district court violate Nava's Fifth Amendment right to due process when it found, under a preponderance standard, that he was criminally liable for an uncharged, unadjudicated methamphetamine offense and used that finding to increase his sentence by 10 to 16 years?

3. Did the district court plainly err by applying a two-level increase, under guideline §3B1.3, to Nava's offense level for abusing a position of private or public trust?

## STATEMENT OF THE CASE

A jury found Jorge Eduardo Nava guilty of conspiracy to possess with intent to distribute five kilograms or more of cocaine and possessing with intent to distribute 500 grams or more of cocaine. The district court sentenced Nava to concurrent terms of 480 months' imprisonment. On appeal, Nava argues that the district court erred in calculating his base offense level by including, as relevant conduct, a quantity of methamphetamine involved in an unrelated, unadjudicated offense. He also contends that the increase in punishment, based on factfinding by a preponderance of the evidence, violated his right to due process. Finally, Nava argues that the district court plainly erred by applying a two-level increase for abuse of a position of trust.

## 1. __The investigation.__

a. *Mississippi methamphetamine offense.*

Federal authorities started investigating Nava after a Ford F-150 pickup truck registered in his name was stopped in Mississippi, on August 16, 2016, and found to contain liquid methamphetamine

in the gas tank. ROA.692–93, 1096.[1] Nava was not with the truck in Mississippi. ROA.1097. An alert for Nava was issued to the ports of entry. ROA.807, 1148. Almost a month later, on September 9, 2016, Nava was detained at the port of entry after attempting to enter the United States from Mexico. ROA.693, 807–08, 1096. Agents Matthew Marvin and Jose Perez questioned Nava about the pickup truck in Mississippi. ROA.693–95, 844–45, 1097–98. Nava denied being involved and said that he had sold the truck, about a month earlier, to "El Primo" for $1,500. ROA.700, 796, 801–02, 1099, 1143. After questioning Nava, the agents determined that he was not involved in the methamphetamine offense. ROA.701, 704, 843, 1099.



---

[1] The government introduced records from the Texas Department of Motor Vehicles showing that the truck was registered in Nava's name. ROA.1964–76.





 They saw the Challenger with a Silverado truck. ROA.732–33. Lara got out of the Challenger and handed the Silverado driver a black backpack.

ROA.733. After the exchange took place, agents stopped the Silverado and found 4 kilograms of cocaine in the backpack. ROA.733–37, 1119.

███████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ Challenger headed out of El Paso on Highway 62/180 heading toward Cornudas and Carlsbad. ROA.741–43, 884, 1124. ████████████████

███████████████████████████████████████

█████████████████████████ Agents Marvin, Perez, and Dilmore headed to the checkpoint. ROA.741–42, 744, 844, 1125. The Challenger was stopped, and the cocaine was found in the car's back seat inside of a red and black duffel bag. ROA.746, 862–63.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████ Lara told Nava that he had made it through the checkpoint headed toward Cornudas. ROA.887. Nava told Lara to call him when he arrived in Carlsbad. ROA.887. ████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████

e. *Nava's arrest.*

On September 20, 2016, Nava was arrested at the port of entry. ROA.1142–43. He was charged with conspiracy to possess 5 kilograms or more of cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and possessing 500 grams

or more of cocaine with the intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). ROA.58–59. He pleaded not guilty and proceeded to jury trial.

**2. Evidence at trial**

At the jury trial, Agents Marvin, Perez, and Dilmore testified. ROA.684–845, 868–959, 1093–1200. ███████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



Lara was involved in a cocaine transaction. ROA.1012. Nava called, saying that he was picking up Lara's car, the Challenger, in Juarez. ROA.1013. Later that evening when Lara was ready to return to El Paso, Nava told him the car

---

[3] The government put into evidence hotel records as well as photographs from the hotel's security cameras verifying this trip. ROA.773, 776, 2191, 2206–11.

was loaded with cocaine. ROA.1014. Nava and Lara drove separately—Nava in front and Lara following him with the cocaine. ROA.1016. Nava went across the bridge first. ROA.1017. He was detained and his vehicle was searched. ROA.1017. Meanwhile, Lara made it across the bridge. ROA.1017. Lara went back to his house, put the 2 kilograms of cocaine into his bedroom, and called Nava. ROA.1018–19. Nava instructed him to cut open the bundles, find the pink sticker with a number, take pictures, and send them to Nava. ROA.1019.

On Sunday, September 11, 2016, Nava called Lara to transport the next load. ROA.1021–22. They met near the bridge in Mexico. ROA.1023. Nava was there with Lara's car, which was loaded with cocaine. ROA.1023–24. Once again, Nava and Lara drove separately. ROA.1024. Nava went across the bridge first; Lara crossed after him. ROA.1024. Lara went back to his house and placed these 2 kilograms of cocaine in his bedroom with the prior two kilograms of cocaine. ROA.1024. Lara then opened the bundles, found the pink stickers, took pictures and sent them to Nava. ROA.1024–25.

The next day, based on information Nava had given him, Lara arranged to meet the buyer at EP Fitness. ROA.1027–28. The buyer was driving a Silverado truck. ROA.1028–29. Lara gave him the

gray and black bag containing the four kilograms of cocaine. ROA.1029, 2124–26.

On Tuesday, September 13, 2016, Nava called Lara and asked if he was ready to start heading north. ROA.1043. Lara went to Nava's apartment complex in El Paso, where he met two men in the parking lot who gave him five kilograms of cocaine in a red and black duffel bag. ROA.1043–45. Lara took pictures of the five bundles to send to Nava. ROA.1046. Nava told Lara that he was going to Denver, and Lara decided to take Highway 62/180. ROA.1047–48, 1075. Lara called Nava saying that he was taking the longest route and needed money. ROA.1048. Nava told Lara that he would send him money at Carlsbad. ROA.1049. ███████████████ ████████████████████████████████████████ At the checkpoint on Highway 62/180, Lara was arrested. ROA.1042–43, 1049–50. The DEA agents took his cell phone. ROA.1052.[4] Lara had

_____

█▎████████████████████████████████████████████
████████████████████████████████████

used that phone to communicate with Nava via WhatsApp and Facebook. ROA.1052.

The government put into evidence many messages from Nava's Facebook account, text messages, jail calls, and audio recordings. *See, e.g.*, ROA.2020–113, 2213–34, 2272–89.[5] The government also introduced photographs and videos from Nava's Facebook account. Many of these pictures and videos were of Nava with cocaine and money in his apartment. *See, e.g.*, ROA.767–78, 890–93, 898–99, 903–09, 913–14. A DEA forensic chemist testified that he tested the cocaine seized on September 13, 2016. ROA.1032–33, 1035–36. The test determined that the cocaine contained tetramisole, a common diluent from South America. ROA.1039.

### 3. **Verdict.**

The jury found Nava guilty of both charges. ROA.183.

### 4. **Sentencing.**

The probation officer prepared a revised presentence report (PSR). ROA.2420–48. The officer grouped the two cocaine counts. ROA.2434; U.S.S.G. §3D1.2(b), (d). The PSR recommended that

---

[5] The government also introduced an affidavit from Facebook. ROA.787–94, 1134, 2235.

Nava be held accountable for 18.72 kilograms of cocaine—5.22 kilograms for charged offenses, 5.4 kilograms from the Little Rock trip, and 8.1 kilograms based on the cocaine and money on Nava's Facebook. ROA.2432–33, 2435; U.S.S.G. §1B1.3.

The PSR also recommended that Nava be held accountable for, as relevant conduct, 29,291.60 grams of liquid methamphetamine (ICE) and .74 grams of methamphetamine from the seizure in Mississippi. ROA.2432–33, 2435; U.S.S.G. §1B1.3.

The facts of the methamphetamine offense: On August 15, 2016, a police officer in Gulfport, Mississippi, pulled over a 1994 F-150 pickup truck for a traffic violation. ROA.2423. The truck was registered in Texas in Nava's name. ROA.2424. Nava was not in the truck. When the officer asked the driver why it was not registered in his/her name, the driver replied that it was because he/she did not have a valid driver's license. ROA.2424. A search of the pickup truck revealed 34.06 liters of pure liquid methamphetamine and 1.25 grams of methamphetamine "concealed within the gas tank" of the truck. ROA.2424. ████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

The PSR stated that the methamphetamine offense was relevant conduct to the cocaine offenses █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

Without the methamphetamine, Nava's base offense level would have been 32. U.S.S.G. §2D1.1(c)(4). With the methamphetamine, the resulting base offense level was 38. ROA.2435. The PSR recommended a number of two-level upward adjustments. ROA.2435–36.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ ██████████

████████████████████████████████████████████


The PSR was revised to include the two-level increase for abuse of position of trust. ROA.2466–69.

The resulting total offense level was 50, which was reduced to 43. ROA.2436; U.S.S.G. Ch.5 Pt.A, comment. (n.2). Without the methamphetamine, the total offense level would have been 40. Nava had two criminal history points from a prior conviction for importation of marijuana in 2011. ROA.2437. The criminal history category II combined with the offense level 43 to produce an advisory Guidelines range of life on the conspiracy count and 480 months on the substantive offense. ROA.2445. Without the methamphetamine, the range would have been 292 to 365 for both offenses.

Nava's attorney filed a written objection to the methamphetamine being included as relevant conduct. ROA.2451–58. He argued that the evidence was insufficient to show that Nava was responsible for the methamphetamine offense and that the offense was not

similar to the cocaine offenses of conviction. ROA.2458 (citing *United States v. Booker*, 334 F.3d 406 (5th Cir. 2003)). Defense counsel also argued that due process requires a higher standard of proof when the adjustment drastically increasing a defendant's sentence based on an unadjudicated offense. ROA.1502–18.

The government responded that the methamphetamine was relevant conduct because 1) the truck was registered in Nava's name not long before it was used to transport the methamphetamine; 2) a recording of Nava discussing that he was registering a truck in his name and "burning it"; 3) the implausibility of Nava's story that he had sold the truck to "El Primo" for $1500; and 4) a jail call in which Nava told his friend Hipo—when he asked "how much time?—that "They got me with two persons, one in Mississippi and … Ernesto." ROA.2494. The government argued that the methamphetamine offense was relevant conduct "based on both the circumstantial evidence and [Nava's] own admission." ROA.2494.

At sentencing, defense counsel reurged the relevant conduct objection. ROA.438–39. He argued that the offenses were not similar because they did not involve the same drug. ROA.438.

█████████████████████████████████████

████████████████ Counsel argued that the evidence was insufficient to show that the methamphetamine in Mississippi was "relevant to what [Nava] was indicted for." ROA.439.

The prosecutor responded by stressing, among other things, Nava's recorded jail conversation with his friend Hipo. ROA.440. In response, defense counsel informed the district court that, a few days before, he had visited Nava "and gave him the bad news that I believed the government was going to try to … hold him culpable for the meth[.]" ROA.446. "[A] few days later, [Nava] calls his buddy and starts talking about it." ROA.446. Counsel told the court that "all the evidence the government is talking about came from me." ROA.447.

The district court overruled the objection "[b]ased on all of the information the Court has before it[.]" ROA.448. The court sentenced Nava to two concurrent terms of 480 months' imprisonment and five years' supervised release. ROA.215–21, 458–59. Nava appealed. ROA.223–24.

# SUMMARY OF THE ARGUMENTS

**I.  The District Court Erred in Calculating Nava's Base Offense Level for His Cocaine Offenses by Including, as Relevant Conduct, a Quantity of Methamphetamine from an Unrelated, Unadjudicated Offense.**

The district court clearly erred when calculating Nava's Guidelines range by including as relevant conduct an unrelated, uncharged, unadjudicated methamphetamine offense. The methamphetamine offense was not part of a common scheme or plan with the cocaine offenses. The methamphetamine offense was not part of the same course of conduct as the cocaine offenses. ███████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████ The methamphetamine offense involved an unnamed driver who drove the truck with pure liquid methamphetamine concealed in the gas tank through Mississippi toward Georgia under the direction of a man called Gaucho. The only evidence linking these offenses was that truck with the methamphetamine was registered in Nava's name. As this Court's precedent shows, that is not sufficient for relevant conduct, under

guideline §1B1.3. With the methamphetamine, Nava's Guideline range was life on the cocaine conspiracy and 480 months on the substantive cocaine offense. Without the methamphetamine, Nava's Guideline range would have been 292 to 365 months. Because the government cannot show that the error was harmless, this Court should vacate the sentence, and remand the case for resentencing.

## II. Permitting Courts To Find a Defendant Committed an Offense by a Preponderance of the Evidence Violates the Fifth Amendment.

Nava's guideline sentencing range increased by 10 to 16 years as the result of a finding, by a preponderance of the evidence, that he had committed an uncharged, unadjudicated offense. This result violates the Fifth Amendment's guarantee of due process, which requires the government to establish facts used to increase a defendant's Guideline range by proof beyond a reasonable doubt. A sentence predicated upon a finding, under the preponderance standard, that a defendant committed an uncharged, unadjudicated offense implicates important interests: the liberty of the defendant, society's confidence and faith in criminal trials, and the reliability

of the sentence. All of these interests are protected by the Due Process Clause. This Court has rejected the argument Nava makes here. *See United States v. Lewis*, 476 F.3d 369, 389 (5th Cir. 2007) (district court may find all facts relevant to Guidelines determination by a preponderance of the evidence). He seeks to preserve it for possible en banc or Supreme Court review.

### III. The District Court Plainly Erred by Applying the Abuse of Position of Trust Enhancement.

The district court increased Nava's offense level by two levels for abusing a position of private or public trust, under guideline §3B1.3. This was wrong. For this enhancement to apply, the defendant must hold a position of trust characterized by professional or managerial discretion. If the defendant holds such a position, there must be evidence it contributed in some significant way to facilitating or concealing the offense.

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████ Because the error affected Nava's substantial rights, this Court should vacate the sentence, and remand the case for resentencing.

## ARGUMENTS AND AUTHORITIES

**I. The District Court Erred in Calculating Nava's Base Offense Level for his Cocaine Offenses by Including, as Relevant Conduct, a Quantity of Methamphetamine from an Unrelated, Unadjudicated Offense.**

In calculating Nava's base offense level for his cocaine offenses, the district court found that he also was responsible, as relevant conduct, for methamphetamine from an uncharged, unadjudicated offense. As a result of the court's calculation, Nava's advisory guidelines sentencing range was increased by between 10 to 16 years' imprisonment. The relevant conduct determination was clearly erroneous. The methamphetamine offense was not relevant conduct because it was not part of the same common scheme or plan or the same course of conduct as the cocaine offenses. Because the government cannot show that the error was harmless, this Court should vacate Nava's sentence and remand for resentencing.

### A. Standard of Review.

The Court reviews a district court's application of the Guidelines de novo and its factual findings for clear error. *United States v. Ortiz*, 613 F.3d 550, 554 (5th Cir. 2010). This Court reviews a district court's determination of what constitutes relevant conduct for purposes of sentencing for clear error. *United States v. Wall*, 180

F.3d 641, 644 (5th Cir. 1999). A factual finding is clearly erroneous if it is not plausible in light of the record as a whole. *United States v. Rhine*, 583 F.3d 878, 885 (5th Cir. 2009).

## B. The Government Failed to Prove That the Methamphetamine Was Attributable to Nava as Relevant Conduct.

The base offense level for drug offenses is determined by the type and quantity of drugs involved. *See* U.S.S.G. §2D1.1. In calculating a defendant's base offense level, the district court may consider other offenses, as long as those offenses constitute "relevant conduct" as defined in the Guidelines. *Rhine*, 583 F.3d at 885; see U.S.S.G. §1B1.3(a)(1)(A)–(B), (a)(2). "Relevant conduct is defined as 'all acts or omissions' that were either (1) part of a 'common scheme or plan' or (2) part of the 'same course of conduct' as the offense of conviction." *Ortiz*, 613 F.3d at 557 (quoting U.S.S.G. §1B1.3(a)(2)). The prior unrelated, unadjudicated methamphetamine offense does not meet either definition of relevant conduct.

### 1. The methamphetamine offense was not part of a common scheme or plan with the cocaine offenses.

An unadjudicated offense may be part of a "common scheme or plan if it is substantially connected to the offense of conviction by

at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *Ortiz*, 613 F.3d at 557 (internal quotations omitted); *see also* U.S.S.G. §1B1.3, comment. (n.5(B)(i)) (2016). The facts do not prove by a preponderance of the evidence that the methamphetamine offense was part of a "common scheme or plan" as the cocaine offenses.

No common factor connected the Mississippi methamphetamine offense to the cocaine offenses. The offenses involved different controlled substances—methamphetamine, including 34.06 kilograms of pure liquid and .74 grams of solid methamphetamine, and powder cocaine. █████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

[REDACTED]

There was no common modus operandi between the offenses.
[REDACTED] The methamphetamine, including 34.06 kilograms pure liquid, was concealed within the gas tank of the truck the driver picked up in Juarez and was taking to Atlanta, Georgia. ROA.2424. There was no evidence on how the

---

[6] The government did not reveal the truck driver's identity.

[7] The government's forensic chemist testified that the cocaine seized had a common diluent from South America. ROA.1033, 1039.

methamphetamine came to be in Juarez; ██████████████████
██████████ who loaded it into the gas tank of the truck; or who it was to be delivered to in Atlanta.

The one common factor between the methamphetamine offense and the cocaine offenses was Nava— ████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████

Nava's only connection to the methamphetamine offense was the pickup truck registered in his name. Nava said, on September 9, 2016, he had sold the truck almost a month earlier to "El Primo" for $1,500. ROA.700, 802, 1143. Almost a month earlier, on August 16, the driver of the pickup truck said that it was registered in

Nava's name because he/she did not have a valid driver's license. ROA.2424. The driver did not indicate that Nava was otherwise involved. ROA.2423–24. He mentioned only Gaucho. ROA.2423–24. And when Agents Marvin and Perez questioned Nava about the truck, they determined that he was not involved in the methamphetamine offense. ROA.701, 704, 843, 1099, 2795.

At trial and sentencing, the government argued that Nava's Facebook message about registering a truck and "burning it" showed that he was connected to the methamphetamine offense. ROA.1139–41, 1143, 1888–89. But that could have been any truck. There was no evidence that the Facebook message was posted before the methamphetamine offense on August 15, 2016. The message could have been posted any time between January 1, 2016, and October 26, 2016. ROA.780. There was no evidence that the pickup truck had been "burned"—driven back and forth across the border. *Compare with United States v. Vasquez*, 370 F. App'x 459, 467 (5th Cir. 2010) (government put into evidence defendants' prior border and checkpoint crossings). The government also argued that Nava admitted his connection when he told Hipo that he was "screwed" because "they got me with two persons, one in Mississippi and …

Ernesto." ROA.440, 1144.[8] Although Nava identified "Ernesto" Lara, he did not identify that person in Mississippi. And Nava's attorney had just told him the government was going argue he was liable for the methamphetamine offense. ROA.446. Nava's proven conduct was registering a truck in his name that, while still in his name, was involved in a methamphetamine offense. The driver did not implicate Nava any further in the methamphetamine offense, and the district court did not make any findings otherwise. *Cf. United States v. Benns*, 740 F.3d 370, 376 (5th Cir. 2014) (district court failed to make specific factual findings on the defendant's uncharged conduct).

But even if Nava was more involved in the methamphetamine offense, that does not make it part of the same common scheme or pan as the offenses of conviction. Indeed, in many of the cases dealing with relevant conduct, the defendant is directly liable for both offenses. In *Rhine*, for example, this Court held that the defendant's prior participation in a drug-trafficking ring was not part of the

---

[8] The presentence report incorrectly states that Nava told Hipo "two of his people were busted." ROA.2477. The translation that the government put into evidence at trial, and relied upon at sentencing, was "they got me with two persons." ROA.440, 1144.

same common plan or scheme as his current attempt to sell a small quantity of crack cocaine to an individual buyer. 583 F.3d at 886. The general purpose of selling drugs for profit, this Court has held, is not sufficient to render an offense relevant conduct. *See Ortiz*, 613 F.3d at 557. The methamphetamine offense was not part of the same common scheme or plan as Nava's cocaine offenses.

### 2. The methamphetamine offense was not part of the same course of conduct as the cocaine offenses.

An unadjudicated offense that is not part of a common scheme or plan with the offense of conviction may still be "relevant conduct if the offenses are part of the 'same course of conduct.'" *Id.* at 557–58; *see also* U.S.S.G. §1B1.3, comment. (n.5(B)(ii)) (2016). Offenses are part of the same course of conduct "if they are sufficiently connected or related to [the offense of conviction] as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* at 558 (internal quotation marks omitted); *see also* U.S.S.G. §1B1.3, comment. (n.5(B)(ii)) (2016). Factors to consider in determining whether offenses are part of the same course of conduct include: the degree of similarity, the regularity (repetitions) of the offenses, and the time interval between the offenses. *Id.* (internal quotation marks omitted). The facts do not prove by a

preponderance of the evidence that the uncharged, unadjudicated methamphetamine offense was part of the "same course of conduct" as the cocaine offenses.

The methamphetamine offense and the cocaine offenses do not share a high degree of similarity. Offenses may be sufficiently similar if there are "distinctive similarities" that signal they are "part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." *Ortiz*, 613 F.3d at 558 (internal quotations omitted). There are no such distinctive similarities here. There was no evidence that the methamphetamine and the cocaine share a common source or supplier. *See United States v. Chavira*, 530 F. App'x 330, 333 (5th Cir. 2013). There was no evidence of common accomplices, suppliers, or buyers between the two offenses. *Ortiz*, 613 F.3d at 558. It is not unique that both drugs came across the border from Mexico. *See, e.g.*, *Vasquez*, 370 F. App'x at 463 (marijuana from Mexico); *United States v. Rodriguez-Garcia*, 657 F. App'x 252, 253–55 (5th Cir. 2016) (methamphetamine from Mexico); *United States v. Ramos-Rodriguez*, 809 F.3d 817, 820 (5th Cir. 2016) (cocaine from Mexico). "The fact that both [methamphetamine] and cocaine are illegal drugs is not enough for us to find that they arise from the same course of conduct." *Ortiz*, 613 F.3d at 558.

To determine the regularity of the offenses, one inquires whether there is a "pattern of similar unlawful conduct directly linking the purported relevant conduct and the offense of conviction." *Rhine*, 583 F.3d at 889–90. There is no pattern of similar unlawful conduct directly linking the Mississippi methamphetamine offense and the cocaine offenses.

It is helpful to consider first the pattern of similar unlawful conduct directly linking the cocaine offenses—the trip in late August 2016 to Little Rock; the EP Fitness seizure on September 12, 2016; and the Checkpoint 62/180 seizure on September 13, 2016. █████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████ In comparison, the Mississippi offense involved pure liquid methamphetamine supplied from Mexico by some unidentified person; the driver, unnamed, who drove the drug-laden truck from Mexico toward Georgia at the direction of a man called Gaucho. There was no evidence Nava was involved in supplying, crossing, transporting, or distributing the

methamphetamine. The photographs, video and audio recordings obtained from Nava's Facebook account all indicate that he was involved in cocaine, not methamphetamine, trafficking.

The interval between the offenses was fairly short. The methamphetamine was seized in Mississippi on August 15, 2016. ROA.2423. The cocaine at issue in the convictions was seized at the Highway 62/180 checkpoint in El Paso on September 13, 2016. ROA.739, 746. But this Court has held the fact that the offenses occurred in the same time frame is not conclusive on relevant conduct. *Ortiz*, 613 F.3d at 558 (holding that the marijuana and cocaine offenses occurring temporally and physically together was not sufficient); *United States v. Heard*, 891 F.3d 574, 576 (5th Cir. 2018) (holding that a close timeline does not automatically convert an offense into relevant conduct for the offense of conviction); *United States v. Dyer*, 220 F.3d 585, 585 (5th Cir. 2000) (unpublished) (holding that the temporal proximity of two uncharged murders to the heroin offense did not make the murders relevant conduct).

The only evidence tying Nava to the methamphetamine was that the pickup truck was registered in his name—and that is not sufficient. *See Ortiz,* 613 F.3d at 558–59. In *Ortiz*, this Court held that there was insufficient evidence to hold the defendant, who was

convicted of marijuana trafficking, accountable for cocaine found in a suitcase the day he was arrested on the marijuana offenses. *Id.* at 552–53. The suitcase was found in the bedroom in which Ortiz slept and in the condominium for which he paid rent. *Id.* at 555. The condominium was also used to store the marijuana he distributed. *Id.* at 554–55. Ortiz admitted to being a regular cocaine user and to using cocaine the morning that the cocaine was found in his bedroom. *Id.* at 555. This Court held that the "speculation, based primarily on the proximity of the cocaine's container, which connected the cocaine to Ortiz … is not evidence that the cocaine and the marijuana were joined in an episode, spree, or ongoing series of offenses." *Id.* at 558–59 (internal quotation marks omitted).

It is speculation that Nava was more involved in the methamphetamine offense. The truck being registered in Nava's name is like the suitcase with cocaine being in Ortiz's condominium. Speculation that Nava was involved in a conspiracy to transport methamphetamine—based primarily on the truck being registered in his name—is not evidence that the methamphetamine and cocaine were joined in an "episode, spree, or ongoing series of offenses." *Id.* at 558–59.

The district court erred in increasing Nava's guideline sentencing range by 10 to 16 years' imprisonment based on the methamphetamine offense being relevant conduct to the cocaine offenses of conviction. Because the government cannot show that the error was harmless, the sentence should be vacated, and the case remanded for resentencing.

## II. Permitting Courts to Find a Defendant Committed an Offense by a Preponderance of the Evidence Violates the Fifth Amendment.

The Supreme Court has held that due process prohibited judicial fact-finding by a preponderance of the evidence when imposing sentence beyond the statutory maximum. *Apprendi v. New Jersey*, 530 U.S. 466, 491 (2000). Subsequently, the Court applied that holding to the Sentencing Guidelines, recognizing that the mandatory nature of the Guidelines meant that judicial determinations of facts violated the defendant's Sixth Amendment right to have his guilt or innocence determined by a jury of his peers. *United States v. Booker*, 543 U.S. 220, 234–35 (2005) (quotation omitted).

The *Booker* Court did not, however, address the Fifth Amendment due process concerns raised by the use of a lax fact-finding standard at sentencing. The Fifth Amendment requires that the

burden of proof applicable to any judicial factual determination reflect the importance of the interests placed at stake by the underlying decision. *Washington v. Harper*, 494 U.S. 210, 229 (1990). At sentencing, the societal and individual interests at issue, as well as the importance of the ultimate decisions to be made, require that the court's fact-finding under the Guidelines be made under the beyond-a-reasonable-doubt standard. Those interests make clear that while the preponderance-of-the-evidence standard is appropriate when interests like money are at stake, a higher standard is, as a matter of due process, required when a defendant's life, physical liberty and future are placed in jeopardy.

### A. Standard of Review.

This Court reviews the district court's application of the Sentencing Guidelines de novo. *Lewis*, 476 F.3d at 389.

### B. A defendant's liberty interest is implicated at sentencing and requires application of the beyond-a-reasonable-doubt standard.

The Fifth Amendment guarantees that no person may be deprived of liberty without due process of law. U.S. Const. amend. V. That constitutional protection exists because "[t]he accused during

a criminal prosecution has at stake [an] interest of immense importance ... because of the possibility that he may lose his liberty upon conviction[.]" *In re Winship*, 397 U.S. 358, 363 (1970). Thus, part of the process to which a criminal defendant is due is a system containing procedural safeguards to ensure that he will not be erroneously deprived of liberty. *Apprendi*, 530 U.S. at 484 (citing *Winship*). To protect against erroneous decisions, courts employ a "beyond a reasonable doubt" standard, which applies not only to the determination of guilt, but also to certain determinations regarding the extent of criminal culpability assigned to a defendant. *Apprendi*, 530 U.S. at 484 (citing *Mullaney v. Wilbur*, 421 U.S. 684 (1975)). Indeed, as the Court noted in *Mullaney*, criminal law "is concerned not only with guilt or innocence in the abstract, but also with the degree of criminal culpability" assigned to a defendant. 421 U.S. at 697–98. Thus, for example, where factual determinations increase the amount of time a defendant spends behind bars, the fact-finding process "is unquestionably of constitutional significance." *Apprendi*, 530 U.S. at 495. For this reason, such decisions should be subjected to a reasonable-doubt standard.

Courts have long recognized the constitutional problem of increasing the length of a defendant's sentence based upon judicial

fact-finding by a preponderance of the evidence. *See, e.g.*, *Booker*, 543 U.S. at 236–37 (citing *Jones v. United States*, 526 U.S. 227, 230 (1999); *United States v. Hammoud*, 381 F.3d 316, 361–62 (4th Cir. 2004) (en banc) (Motz, J., dissenting); *United States v. Rodriguez*, 73 F.3d 161, 162–63 (7th Cir. 1996) (Posner, C.J., dissenting)).

Plainly, Nava's liberty interest was at stake when the district court took up the question of whether he was guilty of the uncharged, unadjudicated methamphetamine offense. The court's finding, by a preponderance of the evidence, that Nava was criminally liable for that offense increased his sentence by 10 to 16 years of imprisonment. The significance of any deprivation of additional liberty, even as applied to a person lawfully subject to some deprivation by virtue of a valid criminal conviction, mandates a heightened standard of proof.

### C. The allocation of risk regarding erroneous determinations warrants applying a reasonable-doubt standard.

The burden of proof "serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423 (1979).

Indeed, "[t]he function of a standard of proof is to 'instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Id.* (quoting *Winship*, 397 U.S. at 370 (Harlan, J., concurring)).

In a civil case, where money—as opposed to a person's freedom—is at issue, the preponderance-of-evidence standard is appropriate. *Winship*, 397 U.S. at 371 (Harlan, J., concurring); *see also Addington*, 441 U.S. at 423 (preponderance standard is warranted because society has "a minimal concern with the outcome" of private civil suits). In a criminal case, however, "society imposes almost the entire risk of error upon itself" by employing the reasonable doubt requirement "to exclude as nearly as possible the likelihood of an erroneous judgment." *Addington*, 441 U.S. at 423. The reasonable doubt standard therefore "plays a vital role in the American scheme of criminal procedure" and is "indispensable to command the respect and confidence of the community in applications of the criminal law." *Winship*, 397 U.S. at 364.

The effect is similar, if not precisely the same, when a guilty person is sentenced excessively based on a fact-finding that only "more likely than not" is correct. Indeed, because factual findings

by a preponderance of the evidence can significantly affect a defendant's prison sentence "in terms of absolute years behind bars," *Apprendi*, 530 U.S. at 495, due process requires application of a heightened burden of proof. Thus, both the interest at stake and the importance of the underlying decision require that the burden of proof allocate the risk of an error in such a way that it is less likely that a defendant will be punished incorrectly.

The problematic risk of error, necessitating a higher standard of proof, is exacerbated by statutes and rules of procedure that render inapplicable the time-tested rules of evidence designed to ensure reliability in judicial factfinding. Fed. R. Evid. 1101(d)(3); *see* 18 U.S.C. § 3661 (Federal Rules of Evidence do not apply at sentencing proceedings); U.S.S.G. §6A1.3(a) (same). For example, in this case, potentially relevant protections, such as the right to confront witnesses, did not apply. *See United States v. Fields*, 483 F.3d 313, 337 (5th Cir. 2007) (confrontation right does not apply at sentencing).

### D. The advisory nature of the guidelines does not diminish the threat posed to the interests protected by the Due Process Clause.

In *Booker*, the Supreme Court held 18 U.S.C. § 3553(b), a key provision of the Sentencing Reform Act, unconstitutional under the

Sixth Amendment's jury clause. Severing that subsection, rather than striking down the entire Act, left § 3553(a) in place as the operative statutory guide to federal sentencing. As a result, the Guidelines remained in effect, but only in an advisory capacity.

But Booker did not return federal sentencing procedure to the pre-Guidelines era in which the trial court had virtually unfettered discretion to sentence a defendant within the statutory range. Rather, the Guidelines continue to play a dominant role in sentencing decisions. *See Peugh v. United States*, 569 U.S. 530, 549 (2013). Indeed, in post-*Booker* sentencing, district courts must start with a Guidelines calculation. *Id.* Thus, it is not surprising that sentencing results end up reflecting the guidelines. Statistics collected by the United States Sentencing Commission show that district courts continue to impose either within-Guidelines sentences or sentences that depart from the Guidelines based on a motion by the Government. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016).

Under the advisory guidelines, district courts will continue to make erroneous critical factual determinations that directly affect a sentence based upon a mere preponderance of the evidence. Individuals will continue to lose their liberty for longer periods of time

based upon these erroneous factual determinations made using a preponderance standard. *Booker* did not analyze or remediate these due process violations.

Due process demands a more exacting standard. "If the Guidelines continue to be important, if facts the Guidelines make significant continue to be extremely relevant, then Due Process requires procedural safeguards and a heightened standard of proof, namely, proof beyond a reasonable doubt." *United States v. Pimental*, 367 F. Supp. 2d 143, 154 (D. Mass. 2005).

In sum, "[w]hen a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as 'a tail which wags the dog of the substantive offense.'" *Apprendi*, 530 U.S. at 495 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986)). The threat posed by fact-finding at sentencing to the interests long protected by the reasonable doubt standard remains very real. A defendant is entitled to have that standard applied when a district court makes factual findings in calculating his applicable sentencing range.

### E. The government cannot prove that, under a reasonable-doubt standard, the district court would have made the same finding.

The government offered evidence that suggested Nava had some connection with the Mississippi methamphetamine offense. The strongest evidence was that the pickup truck involved was registered in his name. The other evidence consisted of recorded statements by Nava. One statement, that may have been made at any time from January 1, 2016, to October 2016, indicated that Nava intended to get a truck, register it in his name, and burn it. The other statement was Nava, while in jail on the cocaine charges, telling his friend Hipo, when he asked how much time Nava was looking at, that the government was going to use the methamphetamine against him as well—"They got me with two persons, one in Mississippi and … Ernesto." ROA.2494. This evidence is insufficient to prove beyond a reasonable doubt that Nava was guilty of the methamphetamine offense.

Accordingly, Nava's due process rights were violated by the district court increasing his sentence by 10 to 16 years' imprisonment based on finding him criminally liable, by a preponderance of the evidence, for an uncharged, unadjudicated offense. Because this

Court has rejected the argument Nava makes here, he seeks to preserve it for possible en banc or Supreme Court review.

## III. The District Court Plainly Erred by Applying the Abuse of Position of Trust Enhancement.

The district court plainly erred by applying the two-level increase for abusing a position of private or public trust, under guideline §3B1.3. ███████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████ Because the error was plain and affected Nava's substantial rights, this Court should vacate the sentence, and remand the case for resentencing.

### A. Standard of Review.

This Court reviews the district court's interpretation and application of the Sentencing Guidelines de novo and the district court's findings of fact for clear error. *United States v. Ramos-Delgado*, 763 F.3d 398, 400 (5th Cir. 2014). Because Nava did not object, review is for plain error. *See* Fed. R. Crim. P. 52(b). "To establish plain error, [Nava] must show that there was (1) an error, (2) the error was clear or obvious, and (3) the error affected his substantial rights." *United States v. Castaneda*, 740 F.3d 169, 171 (5th Cir.

2013) (per curiam). If these three requirements are satisfied, the Court "should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1340 (2016) (internal quotation marks omitted).

## B. The district court plainly erred in applying the abuse of trust enhancement.

In considering whether to apply the enhancement for abuse of a position of trust, under guideline §3B1.3, a sentencing court must conduct a two-step inquiry. *United States v. Ollison*, 555 F.3d 152, 165 (5th Cir. 2009). "First, the court must determine whether the defendant occupied a position of trust at all. If not, the inquiry ends and no enhancement accrues. If, however, this initial query produces an affirmative response, the court must ascertain the extent to which the defendant used that position to facilitate or conceal the offense." *Id.* (cleaned up).

A "position of trust" is a term of art that must mean something more than its colloquial definition. *Id.* This Court has summarized the guideline commentary by instructing that a "position of trust" is characterized by "(1) professional or managerial discretion (i.e.,

substantial discretionary judgment that is ordinarily given considerable deference), and (2) minimal supervision." *United States v. Miller*, 906 F.3d 373, 378 (5th Cir. 2018); *see also* U.S.S.G. §3B1.3, cmt. (n.1) (2016). Under that definition, Nava did not occupy a position of private or public trust.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

A position of trust refers to a position characterized by professional or managerial discretion. §3B1.3, comment. (n.1). Persons holding such positions "ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature." *Id.* "The ability to exercise such professional or managerial discretion is the 'signature characteristic' of one who holds a position of trust." *Miller*, 607 F.3d at 148 (quoting *Ollison*, 555 F.3d at 166 n.9.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



This Court has held that police officers hold positions of public trust. *See United States v. Hale*, 685 F.3d 522, 546 (5th Cir. 2012) (patrol officer with Laredo Police Department); *United States v. Deville*, 278 F.3d 500, 508 (5th Cir. 2002) (Chief of Police for the Town of Duscon). A law enforcement officer has a duty to enforce

the drug laws of the state or nation and to protect the public from illegal drug trafficking. In *Deville*, the police chief was present when a drug trafficker was "packing bundles of marijuana for distribution." *Id.* The police chief made no effort to seize the marijuana or arrest anyone involved. *Id.* This Court held that the police had abused a position of trust. Nava was not a law enforcement officer.

██████████████████████████████████████████████████████
████████████████████████████████████████ In making this argument, the government relied on two cases: *United States v. Brown*, 7 F.3d 1155 (5th Cir. 1993), which relied on *United States v. Hill*, 915 F.2d 502 (9th Cir. 1990). In *Brown* and *Hill*, the courts of appeals held that the primary trait of ██████████████ position of trust is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Brown*, 7 F.3d at 1161 (quoting *Hill*, 915 F.2d at 506). In *Brown*, the defendant's position as a food service manager within a prison was found to be a position of trust. 7 F.3d at 1161–62. In *Hill*, the defendant's position as a truck driver, moving military families' possessions, was found to be a position of trust vis-à-vis those families. 915 F.2d at 505–07.

*Hill* is no longer good law, however. *United States v. Contreras*, 581 F.3d 1163, 1164–67 (9th Cir. 2009), *adopted by United States v.*

*Contreras*, 593 F.3d 1135, 1136 (9th Cir. 2010) (en banc), *overruling Hill*, 915 F.2d 502. The Ninth Circuit overruled *Hill* because the test it used "freedom" to commit a crime "without quick notice" was not the correct test. *Contreras*, 581 F.3d at 1166. The commentary to §3B1.3 had been amended, in 1993, to the current test of "professional or managerial discretion." *Id.* "By the test's plain text, the element of discretion—not ease of detection—is the "decisive factor" in the enhancement. *Id.* (quoting *United States v. Tribble*, 206 F.3d 634, 637 (6th Cir. 2000)). In *Contreras*, the defendant's position as a prison cook was not a position of trust, for purposes of §3B1.3. 581 F.3d at 1164.

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ *See* §3B1.3, comment. (n.1) (examples, an attorney serving as a guardian, a bank executive executing a fraudulent loan scheme, or a physician sexually abusing a patient). Nava was not in a position of trust.

Nava's position also fails to meet the second requirement for abuse of a position of trust—that it "significantly facilitated the commission or concealment of the offense." §3B1.3. ██████████ ████████████████████████████████████████████████


The district court erred in apply-

ing the two-level enhancement under §3B1.3. Because the error affected Nava's substantial rights, this Court should vacate the sentence, and remand the case for resentencing.

## CONCLUSION

For these reasons, Nava's sentence should be vacated and the case remanded for resentencing.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender


s/ Judy Fulmer Madewell
JUDY FULMER MADEWELL
Chief of Appeals
Western District of Texas
727 E. César E. Chávez Blvd., B-207
San Antonio, Texas 78206-1205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of July, 2019, I electronically filed the Brief of Defendant-Appellant with the Clerk of Court using the CM/ECF system which will send notification of such filing to John F. Bash, U.S. Attorney for the Western District of Texas (Attn: Assistant U.S. Attorney Joseph H. Gay, Jr.), via electronic mail.

s/ Judy Fulmer Madewell
JUDY FULMER MADEWELL
*Attorney for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,035 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook.

s/ Judy Fulmer Madewell
JUDY FULMER MADEWELL
*Attorney for Defendant-Appellant*

Dated: July 12, 2019